Filed 10/25/22  Heffernan v. Bilzerian CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CURTIS HEFFERNAN,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAN BILZERIAN, et al.,<br><br>     Defendants and Appellants. | B311531<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV25549) |

APPEAL from an order of the Superior Court of Los Angeles County, Gregory Alarcon, Judge.  Affirmed.

Ryan Ellis Law and Ryan A. Ellis for Defendant and Appellant Dan Bilzerian.

Flangas Law Group and Kimberly P. Stein for Defendant and Appellant Ignite International Ltd.

Workplace Justice Advocates, Tamara S. Freeze and Brenda Armenta; Lim Law Group and Preston H. Lim for Plaintiff and Respondent Curtis Heffernan.

_____

In the course of a dispute between a corporation and one of its former officers, the corporation's CEO told a media outlet that the former officer had been terminated for incompetence. The former officer sued the corporation, its parent corporation and its CEO for defamation. The corporation and CEO brought a motion to strike under Code of Civil Procedure section 425.16, the anti-SLAPP law. The trial court denied the motion on the basis that the CEO's statement about the former officer's termination did not concern an issue of public interest. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Underlying Facts and Allegations of the Complaint

According to his declaration, the CEO (defendant Dan Bilzerian) is "an actor, Internet personality, and professional poker player, with a social media following of approximately 50 million people." He is also the CEO of defendant Ignite International, Ltd. (Ignite).[1] According to Bilzerian, "Ignite is a

---

[1]    Ignite is a wholly owned subsidiary of Ignite International Brands, Ltd., which is also named as a defendant. In the operative complaint, plaintiff uses "Ignite" to refer to both the subsidiary and the parent corporation. Defendants largely do the same, both in the trial court and on appeal. However, only Bilzerian and the subsidiary pursued an anti-SLAPP motion. This was no oversight; the parent was, at the time, pursuing a motion to quash service. Similarly, only Bilzerian and the subsidiary filed notices of appeal from the denial of the anti-SLAPP motion; the parent did not. When we called this to the parties' attention, Bilzerian and the Ignite entities took the position that the parent corporation should be considered an appellant, even though it never filed an anti-SLAPP motion and never filed a notice of appeal. We disagree; the parent corporation is not before us. We therefore partially strike the

2

publicly traded company currently listed on the Canadian Securities Exchange . . . and in the United States on the QTCQX . . . ."[2] It is a "consumer products" company. According to the operative complaint, Ignite sells cannabidiol, cannabis, and beverage products.

It is undisputed that plaintiff Curtis Heffernan was, for a time, employed as an officer of Ignite, and promoted to acting president. He was terminated from Ignite on June 8, 2020. The reasons for his termination, however, are disputed.

According to Heffernan, his employment was terminated when he refused to approve a number of questionable charges – including hundreds of thousands of dollars of Bilzerian's personal expenses – as corporate expenses.[3] According to Bilzerian, Heffernan was terminated because of negligence and incompetence. Bilzerian took the position that it was Heffernan who had authorized hundreds of thousands in wasteful expenses.

---

joint briefs filed by both Ignite entities, to the extent they were filed on behalf of the parent. We use "Ignite" to refer only to the subsidiary, the sole corporate appellant. We recognize, however, that the parties used "Ignite" to refer to both entities and there is some ambiguity in the record as to which entity was intended by any particular reference.

[2]     The record does not reveal the meaning of QTCQX. It may be a typographical error for OTCQX, an over the counter exchange.

[3]     Heffernan filed no declaration in opposition to the anti-SLAPP motion. Our discussion of his position refers to the allegations in his operative complaint.

3

Heffernan alleged that, during "a company meeting," on June 7, 2020, the day before he was fired, Bilzerian falsely accused him of "taking drugs" and "acting strange."

One month later, on July 7, 2020, Heffernan filed suit against Ignite and Bilzerian, alleging three causes of action. Two related to his termination (whistleblower retaliation and wrongful termination in violation of public policy). The third was for defamation based on Bilzerian's alleged statement that Heffernan was taking drugs.

After Heffernan filed the lawsuit, his attorneys issued press releases.[4] Bilzerian was contacted by media outlet TMZ regarding the complaint. Bilzerian told TMZ, in an interview, that Heffernan "was fired for incompetence and negligence and Ignite will be bringing suit against him. His claim is not only frivolous; it is ridiculous."

Heffernan responded by filing a first amended complaint, adding Bilzerian's statement to TMZ as a second basis for his defamation cause of action.

## 2. *Defendants' Anti-SLAPP Motion*

Bilzerian had been named solely in the defamation cause of action. On September 4, 2020, he filed an anti-SLAPP motion, seeking to strike that cause of action.

"An anti-SLAPP motion presents a means by which a defendant, sued for conduct in furtherance of the constitutional right of petition or free speech, can place the burden on a plaintiff to establish that there is a probability of prevailing on the claim

---

[4]    There is no indication in the record as to the content of these press releases. Bilzerian's declaration states only, "After Plaintiff filed his lawsuit and his attorneys issued press releases and spoke to several press agencies, . . ."

or face early dismissal of the action. (Code Civ. Proc., § 425.16, subd. (b)(1).) If the defendant first establishes a prima facie showing that a claim is based on so-called 'protected activity,' the burden switches to the plaintiff to establish the lawsuit has at least minimal merit. [Citation.]" (*Ratcliff v. The Roman Catholic Archbishop of Los Angeles* (2022) 79 Cal.App.5th 982, 997.)

The anti-SLAPP statute itemizes four types of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).)

Bilzerian argued in his motion that the defamation cause of action was based on statements that fell within the protection of subdivision (e)(3) of the statute – as statements made "in a place open to the public or a public forum in connection with an issue of public interest." He argued that his statements about Heffernan fell within this category because they constituted "criticism of a professional's on-the-job performance" which is a matter of public interest. He elaborated that "potential or current investors in Ignite, a public company, have an interest in being informed of an officer's on-the-job performance, making this a matter of public interest. Further, as Ignite offers consumers products, the issue

5

of the President of the company's performance is also an issue of public concern."

Bilzerian argued that a number of courts have held that "internet postings regarding corporate activity" fell within this category of protected speech. (E.g. *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576 (*Ampex*).) He acknowledged that "in determining whether particular communications constitute protected activity under these prongs of the anti-SLAPP statute, courts consider three factors: (1) whether the criticized company is publicly traded; (2) the number of investors; and, (3) whether the company has promoted itself by means of numerous press releases." However, Bilzerian offered no evidence or argument on the latter two factors, content to rely only on the fact that Ignite was a public company.

On September 15, 2020, Ignite filed a joinder in Bilzerian's motion. (See *Barak v. The Quisenberry Law Firm* (2006) 135 Cal.App.4th 654, 661 [joinder in an anti-SLAPP motion is permissible].) Ignite represented that it was joining Bilzerian's motion because Ignite's potential liability for defamation was based on its alleged vicarious liability for Bilzerian's statements.

Heffernan filed an opposition to the anti-SLAPP motion, arguing that the allegedly defamatory statements did not implicate an issue of public interest as his job performance was not of concern to a substantial number of people.[5] Heffernan's

---

[5] Heffernan opposed only Bilzerian's anti-SLAPP motion; he filed no opposition to Ignite's joinder. On appeal, Ignite takes the position that since its joinder was unopposed, the trial court should have granted its "motion." But Ignite never filed an anti-SLAPP motion, it only joined Bilzerian's. Heffernan's non-opposition to Ignite's joinder simply means that Heffernan did

opposition was supported by no evidence; he relied only on the allegations of his complaint.

After the motion was fully briefed, the court issued its tentative ruling denying it. The court accepted the unopposed argument that Bilzerian's statement to TMZ was in a public forum for purposes of the anti-SLAPP analysis. Turning to whether the statements were made in connection with an issue of public interest, the court concluded that Bilzerian and Ignite failed in their burden to show a substantial number of people may have been affected by the subject matter of the statement – the reasons for Heffernan's termination from Ignite. The court particularly considered the three-part test for statements regarding the performance of corporations, and noted that, while defendants had established the first part (that Ignite was publicly traded), they had failed to introduce any evidence on the remaining two parts (the number of investors and whether Ignite had promoted itself by press releases).

The matter was heard on February 24, 2021, where Bilzerian argued against the tentative ruling. He claimed that Heffernan had made his termination a public issue by going public with this lawsuit, thereby injecting himself into the public conversation. He asserted that he had simply responded to Heffernan's public allegations.

The court adopted its tentative and denied the motion. Bilzerian and Ignite filed timely notices of appeal.

---

not dispute Ignite's right to join Bilzerian's motion and tie its right to anti-SLAPP relief to Bilzerian's fate.

## DISCUSSION

**1.    *Standard of Review***

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.]  If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*).)

We are concerned here solely with the first prong.  "The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." (*Wilson, supra,* 7 Cal.5th at p. 884.)  Whether the claims arise from protected activity is a matter we consider de novo, evaluating both the content and context of the alleged activity.  (*Id.* at pp. 884-885.)

Here, defendants argued to the trial court that the allegedly defamatory statements were protected by subdivision (e)(3) of the anti-SLAPP law.  For the first time on appeal, they argue that all four subparts of subdivision (e) apply.[6]  The

---

[6]    At oral argument, counsel for Ignite, but not counsel for Bilzerian, took the position that defendants had based their motion on all four subparts of subdivision (e).  We disagree.  Bilzerian's motion had argued only that, "The Lawsuit Arises Out of Defendant's Statements Made in a Public Forum in Connection With an Issue of Public Interest, and Thus is Subject to California's Anti-SLAPP Statute."  This is the language of subdivision (e)(3).  He did not argue any other subparts applied.

8

California Supreme Court has held that a defendant may not change its theory of anti-SLAPP protection for the first time on appeal. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 321, fn. 10 [defendant had moved under subdivisions (e)(1) and (e)(4), could not pursue (e)(2) on appeal].) We therefore limit our analysis to subdivision (e)(3).

## 2. *Subdivision (e)(3) Does Not Protect Bilzerian's Statements*

Subdivision (e)(3) categorizes as protected speech "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Here, we are concerned with two statements: Bilzerian's alleged statement in a "company meeting" that Heffernan was using drugs and his subsequent statement to TMZ that Heffernan was terminated for incompetence and negligence.

In his declaration, Bilzerian admitted making the latter statement to TMZ. As to the former statement, Bilzerian neither admitted nor denied saying that Heffernan used drugs; he did, however, deny doing so at a "company meeting." He stated that there was no company meeting on June 7, 2020 (the day before Heffernan's termination). Instead, he declared that he saw "other employees of Ignite, the Chief Operating Officer and the new incoming President meeting and walked by and said hello." Bilzerian claimed that he "did ask about [Heffernan] and how he was doing, as I stated he had been acting strange in the past couple of weeks." He added that the decision to terminate Heffernan was made by the board of directors "through a series of separate communications, not an official meeting . . . ." Bilzerian

---

Ignite's joinder did not purport to expand the scope of the motion to other subparts of subdivision (e).

9

added, "Even if a meeting would have occurred as Plaintiff claims, I would have been justified in my opinion that his behavior might have been due to Plaintiff's being under the influence of a controlled substance."

    A.    *Only Bilzerian's Statement to TMZ Was Made in a Public Forum; the Statement Regarding Drugs was Not*

Initially, we must address whether the statements were made in a place open to the public or public forum. It is undisputed that Bilzerian's statement in an interview with media outlet TMZ was made in a public forum.

The same cannot be said of Bilzerian's alleged statement that Heffernan was using drugs, which Heffernan alleged was made in a "company meeting." In their opening briefs, Bilzerian and Ignite assert with no citation to authority, that "[a] company meeting of a public company is a public forum." Even if we were to credit that there was a "company meeting," there is no evidence as to the type of meeting – shareholder, employee, board, annual, official, unplanned, public or private – where Bilzerian allegedly stated Heffernan was using drugs. Bilzerian, critically, denied that there was a "company meeting" at all, declaring that when he spoke to others at Ignite about Heffernan, he simply added the comments when saying "hello" to other Ignite employees he saw meeting each other. He further specifically denied that the decision to terminate Heffernan was made at a meeting of any kind. Given that Bilzerian's declaration is the only *evidence* on the point as Heffernan submitted no evidence, we conclude for present purposes that the statement, if made, was made in the course of a private conversation, and was therefore not made in a place open to the

10

public or public forum. Bilzerian and Ignite have not met their burden to establish that it is protected by subdivision (e)(3).

      B.     *The TMZ Statement Was Not Made In Connection With an Issue of Public Interest*

We now turn to whether Bilzerian and Ignite have established that the second statement, to TMZ, was made "in connection with an issue of public interest."[7] The statement was that Heffernan was terminated for incompetence and negligence. Defendants argue that the issue of public interest implicated by this statement is the "on-the-job performance of senior executives in a public company."

The California Supreme Court has agreed with the appellate "consensus view that ' "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest," ' and that ' "[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." ' [Citation.]" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 (*Rand Resources*).)

Shortly after *Rand Resources*, the California Supreme Court issued its opinion in *FilmOn.com Inc. v. DoubleVerify Inc.*

---

[7] Subdivision (e)(3) of the anti-SLAPP statute protects "any written or oral statement or writing made in a place open to the public or a public forum *in connection with an issue of public interest*" while subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with* a public issue or *an issue of public interest*." (Emphasis added.) As the language we have emphasized is identical in both subdivisions, we rely on caselaw interpreting the language in subdivision (e)(4) as well as subdivision (e)(3).

11

(2019) 7 Cal.5th 133. In *FilmOn*, the court concluded that the context of speech is relevant in determining whether it was made in furtherance of the right of speech in connection with a public issue. (*Id*. at p. 140.) Further, the court held that the analysis requires two parts: first, identifying the issue of public interest implicated by the speech; and second, asking about the functional relationship between the speech and the public conversation about the matter of public interest. (*Id*. at pp. 149-150.) Context is relevant to both of these determinations.[8] (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252.)

There are three "nonexclusive and sometimes overlapping" categories of statements in the public interest. "The first is when the statement or conduct concerns 'a person or entity in the public eye'; the second, when it involves 'conduct that could directly affect a large number of people beyond the direct participants'; and the third, when it involves 'a topic of widespread, public interest.' " (*Rand Resources, supra,* 6 Cal.5th at p. 621.) In considering whether Bilzerian's statement to TMZ satisfies any of these definitions, we first consider it as a statement about Heffernan only, then as a statement about Ignite's operations and investability.

As a statement about Heffernan personally, Bilzerian's representation that he was fired for incompetence and negligence

---

[8]      In their briefing, defendants rely on *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042, for its tautological statement that an issue of public interest is any issue "in which the public takes an interest." As later authority has noted, *Nygard* predates *FilmOn* by more than a decade, and its simplified statement of what it means to be an issue of public interest is no longer viable. (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 822, fn. 8.)

meets none of the three categories. First, it does not concern a person in the public eye. While Bilzerian submitted evidence that he, personally, had achieved a level of internet celebrity, there was no evidence that Heffernan had. Bilzerian argued that Heffernan had injected himself into the public debate by issuing press releases about this lawsuit itself. But Bilzerian's evidence on this point was minimal, consisting only of the statement in his declaration that Heffernan's "attorneys issued press releases and spoke to several press agencies. . . ." With no evidence that Heffernan himself had joined the conversation, we cannot conclude he was in the public eye. Second, the statement did not concern conduct that could directly affect a large number of people beyond the direct participants. The reasons for Heffernan's termination could have little effect on anyone other than Heffernan. Third, the statement did not concern a topic of widespread public interest. The *Wilson* case is illustrative. There, news network CNN fired the plaintiff and told others, including prospective employers, that he was terminated for plagiarism. (*Wilson, supra,* 7 Cal.5th at p. 899.) When the plaintiff sued, CNN brought an anti-SLAPP motion, arguing that the plaintiff's "professional competence and the reasons for his termination" were issues of public interest. (*Id.* at p. 901.) The California Supreme Court disagreed, holding that while "some individuals may be so prominent, or in such a prominent position, that any discussion of them concerns a matter of public interest," that is the exception to the rule. Generally, "absent unusual circumstances, a garden-variety employment dispute concerning a nonpublic figure will implicate no public issue." (*Ibid.*) If the termination of a CNN employee for plagiarism is not a matter of

13

public interest, the termination of plaintiff for incompetence surely is not.

The real battle in this case is whether the result is different if Bilzerian's statement regarding the reasons for Heffernan's dismissal can be construed as a statement regarding Ignite. Preliminarily, we question whether defendants have established that Bilzerian's TMZ statement was, in fact, related to Ignite. Bilzerian did not provide the full context of the statement; the entire interview with TMZ is not part of the record. He stated only that TMZ contacted him "regarding the complaint" and he stated that Heffernan "was fired for incompetence and negligence and Ignite will be bringing suit against him. His claim is not only frivolous; it is ridiculous." There is nothing indicating that, in context, Bilzerian represented that Heffernan's purported incompetence related to Ignite's financial status, value as an investment, or products.

Assuming, without deciding, that defendants have established a prima facie case that Bilzerian's TMZ statement about Heffernan was really a statement about the performance of Ignite's management, they must next establish that Ignite's management is an issue of public interest. Defendants argue, correctly, that reports of corporate mismanagement involving publicly traded companies have been held to be statements of public interest. But while some cases have simply accepted, with little analysis, that such statements implicate matters of public interest when the company is publicly traded (see *Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 918; *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 151), other courts have taken a more nuanced approach. Those courts have asked not only if the corporation is publicly traded, but also the

14

number of investors and whether the company has promoted itself in the press, in order to determine whether statements regarding corporate mismanagement truly implicate the public interest. (*Ampex, supra,* 128 Cal.App.4th at p. 1576; *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693-694; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1008; see also *Global Telemedia Int'l., Inc. v. Doe 1* (C.D. Cal. 2001) 132 F.Supp.2d 1261, 1265.)

We believe the latter cases are the better reasoned, in that they better reflect the three overlapping categories of statements in the "public interest." We are ultimately concerned with whether the corporate entity is in the public eye, statements concerning it could directly affect a large number of people, or its management is a topic of widespread public interest. The mere fact that a corporation is publicly traded does not by itself meet any of these categories. But if the company has a large number of shareholders, statements regarding its mismanagement could have a direct financial effect on a large number of people. If the company regularly promotes itself through press releases, it can be assumed to have generated widespread public interest about its management.

Here, Bilzerian recognized this three-part test in his moving papers, but submitted no evidence regarding the number of shareholders or whether Ignite had promoted itself in the press. When Ignite joined his motion, it made no effort to fill this void in proof. The evidence that Ignite's management is an issue of public interest consists only of evidence that Ignite is publicly traded "on the Canadian Securities Exchange . . . and in the United States on the QTCQX"; and that Bilzerian, personally, has a large social media following. Without further evidence that

15

Ignite has a large number of shareholders and/or that Ignite, rather than Bilzerian, is a topic of interest on social media, defendants have not made a prima facie case that the management of Ignite is an issue of public interest.[9]

### DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Bilzerian and Ignite shall pay Heffernan's costs on appeal.[10]


RUBIN, P. J.

WE CONCUR:


MOOR, J.


KIM, J.

---

[9] In his reply brief on appeal, Bilzerian states, "This lawsuit prompted hundreds of public posts on YouTube, numerous media reports including Forbes, and prompted at least one regulatory investigation." These purported facts are not supported by anything in the record, and we disregard them.

[10] Heffernan requests an award of attorney's fees on appeal. A prevailing defendant on an anti-SLAPP motion is entitled to his attorney's fees. A prevailing plaintiff is entitled to his attorney's fees only "[i]f the court finds that the [anti-SLAPP motion] is frivolous or is solely intended to cause unnecessary delay." (Code Civ. Proc., § 425.16, subd. (c)(1).) We believe the matter is best raised in the trial court in the first instance.

16